Filed 12/12/25  Whispering Oaks Residential Care Facility v. Travelers Property etc. CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| WHISPERING OAKS RESIDENTIAL CARE FACILITY LLC et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> TRAVELERS PROPERTY CASUALTY COMPANY OF AMERICA et al., <br><br> Defendants and Respondents. | H052423 <br> (Santa Clara County <br> Super. Ct. No. 18CV336673) |

In this insurance coverage dispute, plaintiffs Whispering Oaks Residential Care Facility LLC (Whispering Residential), Whispering Oaks RCF Management Co. Inc. (Whispering Management), and Naren Chaganti sued a third party's insurer, Travelers Property Casualty Company of America (Travelers).  Plaintiffs alleged that Travelers owed them a duty to defend and indemnify in various proceedings and investigations stemming from a frozen pipe on plaintiffs' premises.[1]  At summary judgment, the trial court ruled that Travelers owed plaintiffs coverage only where, as relevant here, a " 'suit' " alleged " 'damages' " because of " 'property damage,' " as those terms were used in the insurance policy.  Reasoning that none of the proceedings identified by

---

[1] By this lawsuit, plaintiffs are not seeking coverage for any losses they suffered as an immediate result of the frozen pipe.  Rather, their coverage claims address only Travelers's duty to defend and indemnify.

plaintiffs qualified, the court ruled that Travelers did not owe plaintiffs a duty to defend or indemnify.

Plaintiffs also pleaded a tort claim for interfering with a contract between plaintiffs and a third party, which the trial court ruled at summary judgment was barred by the statute of limitations.

Plaintiffs appeal from the judgment for Travelers and individual defendant Joseph Tancredy, challenging the summary judgment ruling, the denial of a motion to compel, and the award of costs to defendants as the prevailing parties. We will affirm the judgment.

## I.    BACKGROUND

### A.    *The Operative Third Amended Complaint*

Plaintiffs alleged as follows.

In 2008, Cricket Communications Inc. (Cricket) leased space on a water tank owned by Whispering Oaks Health Care Center Inc. "for the transmission and reception of radio communication signals" and related "facilities" and "equipment" that Cricket would "install and maintain." The lease required Cricket to secure commercial general liability insurance in an aggregate amount of $1 million, which could be satisfied by an endorsement on Cricket's master policy. Whispering Oaks Health Care Center Inc. assigned the lease to Whispering Residential and Whispering Management. Chaganti is the "sole owner, member, officer and shareholder" of Whispering Residential and Whispering Management.

Cricket was insured under a commercial general liability insurance policy from Travelers. The policy included a Technology Xtend endorsement that covered plaintiffs as Cricket's landlord.

In January 2010, a water pipe froze. The incident caused substantial loss to plaintiffs' property and business and led to numerous civil proceedings and criminal investigations. Plaintiffs made a claim to Cricket, which referred the matter to Travelers.

2

According to the operative complaint, defendants knew or should have known that Travelers had a duty to defend plaintiffs under the policy in "numerous actions" caused by "the frozen pipe incident." But, plaintiffs claimed, Travelers, including through Tancredy, "made false statements and/or concealed material facts" about the existence and terms of the policy and denied the required defense. Plaintiffs alleged they had no opportunity to review the policy until March 2018.

Plaintiffs pleaded seven relevant causes of action: (1) declaratory relief addressing (a) whether defendants owed plaintiffs a duty to defend and indemnify "numerous suits and investigations" and (b) whether plaintiffs are beneficiaries of the policy Cricket obtained from Travelers; (2) breach of the insurance contract; (3) breach of the duty of good faith and fair dealing in the insurance contract; (4) bad faith refusal to honor the insurance contract; (5) misrepresentation and concealment of the insurance policy and its provisions; (6) vexatious failure to pay under the policy; and (7) conspiracy with Cricket to (a) terminate Cricket's lease with plaintiffs and (b) prevent plaintiffs from enjoying the insurance benefits to which they were entitled under the lease.[2] The first six causes of action were based on Travelers's alleged duty to defend and indemnify plaintiffs in unspecified proceedings.

**B.** *The Summary Judgment Ruling*

Defendants moved for summary judgment or in the alternative summary adjudication, addressing plaintiffs' claims in two groups. Defendants asserted that the first six causes of action failed because they depended on their alleged duty to defend or indemnify plaintiffs under the policy, but they owed plaintiffs no such duty. Defendants argued that the seventh cause of action (1) was not adequately pleaded as a conspiracy

_____

[2] Plaintiffs' eighth and ninth causes of action were not pleaded against defendants. The trial court sustained Travelers's demurrer to the 10th through 12th causes of action, none of which were pleaded against Tancredy. Plaintiffs do not challenge the demurrer ruling or the denial of leave to amend.

claim; (2) failed on the merits as a tortious interference claim; and (3) was barred by the statute of limitations as a tortious interference claim.

While defendants' summary judgment motion was pending, plaintiffs unsuccessfully moved to compel Travelers to provide further responses to certain documents requests. Focusing on plaintiffs' coverage claims, the trial court denied as irrelevant discovery targeted at whether Travelers induced Cricket to terminate its lease with Whispering Residential and Whispering Management.

The trial court granted summary judgment for defendants. It ruled that the first six causes of action failed because Travelers had no duty to defend or indemnify plaintiffs and that the seventh cause of action was a time-barred tortious interference claim. The court rejected defendants' alternate ground for resolving the seventh cause of action, ruling that defendants had not carried their initial burden of showing that the claim was substantively deficient.

**C.** *Entry of Judgment and Appeal*

The trial court entered judgment awarding defendants their costs of suit from plaintiffs. It amended the judgment specifying that defendants' costs were $2,534.65. Plaintiffs timely appealed.

## II. DISCUSSION

**A.** *Summary Judgment*

When a defendant has prevailed on summary judgment, " ' "we review the record de novo to determine whether [they have] conclusively negated a necessary element of the plaintiff's case or demonstrated that under no hypothesis is there a material issue of fact that requires the process of trial." ' " (*Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 767.) The moving defendant "bears the burden of persuasion that there is no triable issue of material fact and that [it] is entitled to judgment as a matter of law." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850.) Upon a defendant's prima facie showing of the nonexistence of a triable issue of material fact, the plaintiff "is then

4

subjected to a burden of production . . . to make a prima facie showing of the existence of a triable issue of material fact." (*Ibid*.) "We liberally construe the evidence in support of the party opposing summary judgment and resolve doubts concerning the evidence in favor of that party." (*Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1037.)

Plaintiffs contend that the trial court erred in granting summary judgment in that (1) plaintiffs were entitled to coverage under the Travelers insurance policy; (2) plaintiffs were entitled to a declaration that they were insured under the policy; (3) plaintiffs' claim for interference with the Cricket lease was not barred by the statute of limitations; and (4) defendants' moving papers were deficient in various ways. But defendants carried their initial burden of production and ultimate burden of persuasion to demonstrate their entitlement to summary judgment.

### 1. *Coverage Claims*

Challenging the first six causes of action, defendants submitted the insurance policy, interrogatory responses identifying the proceedings for which plaintiffs claimed Travelers owed a duty to defend and indemnify, and documents indicating the scope of the identified proceedings. The trial court ruled that Travelers had no duty as to any of the alleged proceedings, so the first six causes of action failed.

Plaintiffs dispute the trial court's application of the policy and additionally contend that some or all of the coverage claims are beyond the reach of defendants' motion because: (1) Travelers is estopped from denying coverage; (2) defendants' separate statement was defective (Cal. Rules of Court, rule 3.1350(d)(1)); and (3) defendants failed to address all of the issues on which plaintiffs sought declaratory relief in their first cause of action, overlooking plaintiffs' assertion of a dispute concerning their status as insureds under the policy.

As we will explain, defendants established that the alleged proceedings in which plaintiffs claim Travelers owed them a duty were: (1) a government petition for injunction and civil penalties to enforce the Missouri Safe Drinking Water Law filed

5

against plaintiffs; (2) a licensing-related administrative complaint Whispering Residential and Whispering Management filed against the Missouri Department of Health and Senior Services; (3) two lawsuits plaintiffs filed against Cricket;[3] (4) a St. Louis County notice to vacate served on Whispering Residential; (5) federal document subpoenas served on Whispering Residential and Whispering Management; and (6) a Missouri Medical Board complaint against Chaganti's brother. Applying undisputed policy text to the alleged proceedings plaintiffs identified, we conclude that Travelers had no duty to defend or indemnify. We reject plaintiffs' remaining attempts to preserve their coverage claims.

### a.  *The Insurance Policy*

The Travelers commercial general liability insurance policy identified Cricket as a named insured. The policy's Technology Xtend endorsement provided that "[a]ny person or organization that is a premises owner, manager or lessor is an insured, but only with respect to liability arising out of the ownership, maintenance or use of that part of any premises leased to you."[4] For summary judgment purposes, there is no dispute that under this provision plaintiffs are insureds under the policy because liability arose out of that part of the premises plaintiffs leased to Cricket.

Under the policy, Travelers "will pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury'[5] or 'property damage'[6] to

---

[3] One of the suits was filed by Chaganti as assignee of rights from Whispering Residential and Whispering Management.

[4] When the policy refers to "you," the reference includes Cricket.

[5] Bodily injury is defined in the commercial liability coverage form as "bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time," but an endorsement amends that definition to include physical harm and mental harm resulting from physical harm.

[6] Property damage includes "[p]hysical injury to tangible property [and] all resulting loss of use of that property" as well as "[l]oss of use of tangible property that is

6

which this insurance applies.  [Travelers] will have the right and duty to defend the insured against any 'suit'[7] seeking those damages" but "no duty to defend the insured against any 'suit' seeking damages for 'bodily injury' or 'property damage' to which this insurance does not apply."  The insurance described in the commercial general liability coverage form applies to " 'bodily injury' and 'property damage' only if" caused by an " 'occurrence' "[8] during the policy period.  A Web Xtend Liability endorsement expands the definition of "suit" to include "a civil proceeding in which damages because of" covered injury or damage "are alleged."

### b. *Legal Principles Governing Policy Interpretation*

" '[I]nterpretation of an insurance policy is a question of law.' "  (See *Palmer v. Truck Ins. Exchange* (1999) 21 Cal.4th 1109, 1115 (*Palmer*); accord *Seeck v. Geico General Ins. Co.* (Mo. 2007) 212 S.W.3d 129, 132.)  Although plaintiffs contend that the policy must be interpreted under Missouri law, we need not choose between Missouri and California law, because our analysis is the same.  We apply " 'the ordinary rules of contractual interpretation' " to infer " 'the mutual intention of the parties' " in contracting for a policy of insurance.  (*Palmer*, at p. 1115.) We interpret the policy's "written provisions" in context, giving the "terms their ' "ordinary and popular sense," unless "used by the parties in a technical sense or a special meaning is given to them by

---

not physically injured."  But there is an exclusion for property damage to "[p]roperty you own, rent, or occupy."

[7] Under the commercial liability coverage form, a suit is "a civil proceeding in which damages because of 'bodily injury', 'property damage' or 'personal and advertising injury' to which this insurance applies are alleged."  The definition includes "[a]n arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with our consent" and "[a]ny other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent."

[8] An occurrence is "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."

usage." ' " (*Ibid.*; *Seeck*, at p. 132 ["Absent an ambiguity, an insurance policy must be enforced according to its terms"].)  "A policy provision is ambiguous only if it is susceptible to two or more reasonable constructions despite the plain meaning of its terms within the context of the policy as a whole." (*Palmer*, at p. 1115, italics omitted; accord, *Seeck*, at p. 132.)  If a provision is ambiguous, a "court may then 'invoke the principle that ambiguities are generally construed against the party who caused the uncertainty to exist (i.e., the insurer) in order to protect the insured's reasonable expectation of coverage.' " (*Palmer*, at p. 1115; see also *Seeck*, at p. 132 ["appl[ying] 'the meaning which would be attached by an ordinary person of average understanding if purchasing insurance,' [citation], and resolve[] ambiguities in favor of the insured"].)

### c. *Travelers's Duty*

Plaintiffs do not dispute that the policy only obligated Travelers to defend or indemnify suits seeking damages for covered injury or property damage.  Plaintiffs do dispute defendants' contention that plaintiffs can identify no qualifying suit giving rise to the duty to defend or indemnify.  As we will explain, defendants carried their burden as to the first six causes of action by showing that plaintiffs cannot identify a covered suit.[9]

### i. *The Missouri Safe Drinking Water Law Enforcement Action*

On January 14, 2010, the State of Missouri through its Attorney General, the Missouri Department of Natural Resources, and the Missouri Safe Drinking Water Commission petitioned for injunctive relief and civil penalties against plaintiffs alleging violations of the Missouri Safe Drinking Water Law.  The government alleged that plaintiffs operated a water distribution system but (1) lacked a certified operator; (2) lacked an emergency operations plan; (3) failed to monitor quality; and (4) failed to maintain adequate water pressure on "January 8, 2010, and other dates not yet known."

_____

[9] Defendants' showing was sufficient to carry their initial burden on the coverage issue, and plaintiffs did not raise any material factual disputes on that issue in their opposition.

8

The government sought injunctive relief prohibiting plaintiffs "from any further violations of the Missouri Safe Drinking Water Law and its implementing regulations" and "from operating the facility and from dispensing drinking water until the Department has determined that the facility is operating in compliance with the Safe Drinking Water Law." The government requested civil penalties of $50 per day for the first violation and $100 per day for each successive violation and "all costs of these proceedings." In an April 2011 amended petition against only Chaganti and Whispering Residential, the government added a claim that pipes burst in December 2010.[10]

After a jury trial, the court entered judgment against Whispering Residential reflecting, among other relief, civil penalties of $135,650—originating with a $50 civil penalty for failing to maintain minimum water pressure on January 8, 2010. The judgment included equitable relief requiring Whispering Residential to (1) develop, implement, and submit an approvable emergency operations plan; (2) obtain services of a certified operator and place their water system under the supervision of a certified chief operator; and (3) not operate any other public water system in Missouri.[11]

Defendants argue, as they did in the trial court, that the enforcement action is not covered because (1) the government sought civil penalties rather than damages and, even if the penalties were tantamount to damages, (2) the government alleged no predicate covered injury, not even the property damage plaintiffs argued was the root of the

---

[10] After defendants filed their respondent's brief, plaintiffs moved for our consideration—by augmentation, judicial notice, or an evidentiary hearing—of extrarecord documents about this enforcement action. The only document plaintiffs proffered, however, is the government's motion for preliminary injunction in the enforcement action. We decline to expand the summary judgment record beyond what the parties presented to the trial court. (See *Vons Companies, Inc. v. Seabest Foods, Inc.* (1996) 14 Cal.4th 434, 444, fn. 3.) The motion is denied.

[11] In its original form, the judgment barred Whispering Residential from operating any public water system in Missouri; the judgment was amended to permit Whispering Residential to operate the one water system at issue.

9

enforcement action. The trial court ruled that the enforcement action was not a " 'suit' " involving " 'damages' " stemming from covered " 'property damage.' "

On appeal, plaintiffs contend that their costs in complying with the equitable relief are " 'damages' " because this was an "environmental enforcement action[]" and the civil penalties sought were damages because they were remedial. But we agree with the trial court's conclusion that the injunctive relief and civil penalties at issue in the Missouri Safe Drinking Water Law enforcement action are not "damages," so the enforcement action was not covered.

Missouri and California courts have interpreted insurance policies' undefined "damages" terms in the context of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA; 42 U.S.C. § 9601 et seq.). (See *Farmland Industries, Inc. v. Republic Ins. Co.* (Mo. 1997) 941 S.W.2d 505, 508 (*Farmland*); *AIU Ins. Co. v. Superior Court* (1990) 51 Cal.3d 807, 825–842 (*AIU*).) Under CERCLA, the costs of removing or remediating an environmental harm "are commonly known as 'environmental response costs.' The government may require a responsible party to pay environmental response costs through one or more means." (*Farmland*, at pp. 506–507.) The government may do the environmental remediation itself and sue for reimbursement, it can sue to compel abatement, or it can secure a consent decree requiring a response action. (*Id*. at p. 507.)

The *Farmland* court ruled that "[t]he ordinary meaning of damages . . . includes environmental response costs required by the government." (*Farmland*, *supra*, 941 S.W.2d at p. 508.) This is so even where equitable relief is the government's vehicle to compel removal and remediation because "the equitable relief at issue is a cost that Farmland is legally obligated to pay as compensation or satisfaction for a wrong or injury." (*Id*. at p. 509.) Put differently, "[t]he word 'damages' is used to make clear that insurers are obligated to cover both direct and consequential losses because of property damage for which an insured can be held liable." (*Id*. at p. 510.) But "fines or penalties

10

are not included within the ordinary meaning of 'damages.' The ordinary meaning of a 'fine' or 'penalty' is not compensation or reparation for an injury; rather, it is a sum imposed as punishment." (*Id*. at pp. 510–511.)

Similarly, the *AIU* court reasoned that "[t]he ordinary, nontechnical meaning of 'damages' . . . encompasses reimbursement of response costs." (*AIU*, *supra*, 51 Cal.3d at p. 828.) The out-of-pocket costs of investigating the release of hazardous waste into water and removing the waste were a loss. (*Id*. at pp. 828–829.) Reimbursement of the response costs was " 'compensation' " for the loss. (*Id*. at p. 829.) The court also held that, in the CERCLA context, "injunctive relief and reimbursement of response costs serve substantially the same purpose" so the "policy language is ambiguous as applied to remedial and mitigative costs incurred pursuant to injunction under CERCLA and similar statutes, and therefore must be construed in favor of coverage." (*Id*. at p. 841.) But the court cautioned that the costs to comply with an injunction based on conduct that did not cause the plaintiff any cognizable property or personal damage "might not be covered." (*Id*. at p. 839.)

Applying the ordinary meaning of "damages" recognized by either Missouri or California, "damages" does not extend to the equitable relief and civil penalties at issue here: The remedies sought by the government were not compensatory.

The equitable relief here required Whispering Residential to operate its well in compliance with Missouri law in the future by hiring necessary personnel and preparing an emergency plan. The government never sought injunctive relief beyond compelling future compliance with Missouri law. Unlike the CERCLA cases on which plaintiffs rely, the injunctive relief at issue here does not involve anything analogous to the removal or remediation of contamination caused by hazardous waste. (Cf. *Farmland*, *supra*, 941 S.W.2d at p. 509; *AIU*, *supra*, 51 Cal.3d at pp. 829, 841.) The equitable relief sought here involved no payment as compensation or satisfaction for a wrong or injury.

11

The civil penalties the government sought and obtained were a statutorily fixed per-violation sum payable to the government.  (See Mo. Rev. Stat. § 640.130.)  The petition called for the penalties to be paid to the State of Missouri (St. Louis County School Fund), although Whispering Residential was ultimately ordered to pay the State of Missouri (St. Louis County).  Neither the St. Louis County School Fund nor St. Louis County were party to the litigation, and neither were alleged to have suffered damage.  The undisputed material facts defendants developed reflect that the civil penalties sought and awarded under Missouri law were not compensation for an injury, but a sum imposed as punishment for statutory violations as to staffing, planning, and maintenance of water pressure.  (See generally *Farmland*, *supra*, 941 S.W.2d at p. 511 [observing that civil penalties would not be damages if they were "a sum imposed as punishment" rather than "compensation or reparation for an injury"].)

Plaintiffs' attempt to analogize the civil penalties provision here to the statutory damages made available by the Telephone Consumer Protection Act of 1991 (TCPA; 47 U.S.C. § 227 et seq.) is unpersuasive.

The TCPA restricts " 'unsolicited, automated telephone calls to the home and . . . certain uses of facsimile ([f]ax) machines and automatic dialers.' [Citation.]  The act allows a private right of action for recipients of unsolicited communications that violate the act. [Citation.]  The recipients can bring 'an action to recover for actual monetary loss from such a violation, or to receive $500 in damages for each such violation, whichever is greater.' " (*Columbia Casualty Co. v. HIAR Holding, L.L.C.* (Mo. 2013) 411 S.W.3d 258, 261.)  In holding that a class action seeking statutory damages under the TCPA was not a penalty or a fine exempt from the defendant violator's insurance coverage for property damage and advertising injury, the Missouri Supreme Court reasoned that TCPA statutory damages were intended at least in part to remedy " 'uncertain and hard-to-quantify actual damages,' including 'loss of use of equipment and phone lines for outgoing and incoming faxes, the expense of paper and ink, and the

12

resultant inconvenience and annoyance . . . [of] unsolicited fax advertisements . . . interfer[ence] with company switchboard operations and burdens [on] the computer networks of those recipients who route incoming faxes into their electronic mail systems.' " (*HIAR*, at pp. 267–268.)

Here, in contrast, no one in the enforcement action claimed an injury caused by plaintiffs' statutory violations. Plaintiffs' violations of the Missouri Safe Drinking Water Law subjected them instead to nonremedial fines or penalties.

Plaintiffs argue that even if the government's lawsuit sought fines or penalties, the suit is covered because the Travelers policy contains an exclusion for certain sorts of penalties, suggesting that penalties not expressly excluded are covered damages. Specifically, plaintiffs point to exclusions for (1) " '[b]odily injury' or 'property damage' arising out of the willful violation of a penal statute"; (2) " 'bodily injury', 'property damage', 'personal injury', 'advertising injury' or 'website injury' arising out of unsolicited communications by or on behalf of any insured" including actual or alleged violations of the TCPA or other statutes "that bar, prohibit or penalize such communications"; and (3) "taxes, fines, interest, penalties or other cost imposed under, or resulting from, any provision of the Internal Revenue Code of 1986, as amended, or any similar state or local law." Plaintiffs contend that these exclusions signify that the omission of any corresponding exclusion for penalties under the Missouri Safe Drinking Water Law would create a reasonable understanding that the latter are covered. We disagree. Nothing about these exclusions suggests that the civil penalties at issue here were damages in the first instance.

### ii. *Notice to Vacate*

On January 11, 2010, St. Louis County served Whispering Residential with a notice to vacate the building within 48 hours, because there was "[n]o running water service to plumbing fixtures" and "[s]ewage waste overflowing water closets." The county also specified that "the residents of this building must be relocated to

13

state[-]approved facilities that are capable of providing for their special care needs." According to a declaration Chaganti filed in other litigation, which defendants included in support of their summary judgment motion, state officials evacuated the nursing home and placed the residents at other locations.[12]

In the trial court, defendants argued that the notice to vacate was not a " 'suit' seeking 'damages' " for covered injury because it "was not an adjudicative proceeding . . . wherein liability may be determined and covered damages awarded." Plaintiffs responded in the trial court and maintain on appeal that the notice was an injunction arising from an occurrence, which is covered for the same reasons that the Missouri Safe Drinking Water Law enforcement action is covered. And plaintiffs assert that because the "term 'suit' is defined as 'a civil proceeding' including 'arbitration' and 'any other alternative dispute resolution' proceeding," it extends to a quasi-judicial administrative proceeding and any coercive government actions. But for the proposition that coercive government action satisfied the policy definition of a "suit," plaintiffs merely cited cases from a handful of states from outside of Missouri or California where the term was undefined. (See *Aetna Casualty & Surety Co. v. Commonwealth* (Ky. 2005) 179 S.W.3d 830, 836–838 [holding that costs of participating in Environmental Protection Agency administrative process were within reasonable expectations based on the undefined term " 'suit' "]; *R.T. Vanderbilt Co., Inc. v. Continental Casualty Co.* (2005) 273 Conn. 448, 454, 465; *Johnson Controls, Inc. v. Employers Ins. Of Wausau* (Wis. 2003) 665 N.W.2d 257, 281–285; *Compass Ins. Co. v. City of Littleton* (Colo. 1999) 984 P.2d 606, 622.)[13]

---

[12] Chaganti's declaration referred to both a notice to vacate and a condemnation notice. The interrogatory responses on which defendants rely to identify the alleged proceedings for which plaintiffs claim coverage referred only to condemnation. But on appeal plaintiffs characterize the alleged suit at issue as the notice to vacate, making no mention of the condemnation.

[13] Under California law, our Supreme Court has held that the undefined term "suit" unambiguously refers to " 'a civil action commenced by filing a complaint.' "

14

The definition of "suit" in the policy does not encompass the notice to vacate. Under the commercial liability coverage form and the Web Xtend endorsement, a suit is "a civil proceeding" alleging covered damages, an "arbitration proceeding in which such damages are claimed and to which [the insured] must submit or do[es] submit with our consent," or "[a]ny other alternative dispute resolution proceedings in which such damages are claimed and to which [the insured] submit[s] with our consent." Defendants have satisfied their initial burden of demonstrating that the notice to vacate was not a suit because it was simply a demand that plaintiffs vacate the premises, not a civil, arbitral, or alternate dispute resolution proceeding. Plaintiffs suggest that the notice to vacate, absent compliance, could have been followed by some form of civil, arbitral, or alternate dispute resolution proceeding, but plaintiffs produced no evidence that such proceedings were involved.[14] So defendants established for the purposes of summary judgment that the notice to vacate did not give rise to coverage.

---

(*Ameron Internat. Corp. v. Insurance Co. of State of Pennsylvania* (2010) 50 Cal.4th 1370, 1379, quoting *Foster-Gardner, Inc. v. National Union Fire Ins. Co.* (1998) 18 Cal.4th 857, 878.) The court has since broadened the definition of suit, to include certain federal administrative adjudicative proceedings before an administrative law judge. (See *Ameron*, at pp. 1374–1375; see also *id*. at p. 1388 (conc. opn. of Kennard, J.).) But even as relaxed, under California law, the undefined term " 'suit' " requires "actual . . . proceedings." (*Foster-Gardner*, at p. 878.)

[14] The absence of any proceedings distinguishes *Houser Holdings CA, LLC v. Tokio Marine Specialty Ins. Co.* (N.D.Cal. 2024) 738 F.Supp.3d 1226, 1228, where the District Court ruled that a county-initiated hearing to recover "damages that Houser allegedly owed to the [c]ounty for doing repair work" was a " 'suit' " as defined in the policy so the insurance company owed Houser a duty to defend. Nor have plaintiffs developed their analogy to Civil Code section 910, subdivision (a), which provides for a written notice of claim that has "the same force and effect as a notice of commencement of a legal proceeding." The Missouri cases plaintiffs invoke are similarly inapposite. (See *D.R. Sherry Constr., Ltd. v. American Family Mut. Ins. Co.* (Mo. 2010) 316 S.W.3d 899, 904, 906 [holding that insured was entitled to coverage of damages it was legally obligated to pay under pre-suit settlement agreement resolving customer's claim of property damage]; *Brown Group, Inc. v. George F. Brown & Sons, Inc.* (Mo.Ct.App. 1997) 963 S.W.2d 285, 286–288 [holding that remediation costs undertaken

15

### iii. *Federal Subpoenas*

The federal document subpoenas served on Whispering Residential and Whispering Management related to an investigation into "criminal health care fraud." So the subpoenas were unrelated to the frozen water pipe or any other "occurrence" under the policy or any suit seeking damages from plaintiffs because of covered injury or damage. Plaintiffs instead suggest that the fraud investigation was *motivated* by the water pipe incident. But the federal government's undeclared motivations for investigating alleged health care fraud do not change the basis for their claim. Travelers did not owe a duty to defend or indemnify plaintiffs in connection with alleged fraud.

### iv. *The Proceedings Against Third Parties*

The remaining proceedings are suits filed by plaintiffs and a Missouri Medical Board disciplinary complaint against Chaganti's brother. None are related to any suit seeking damages from plaintiffs because of covered injury or damage.

As to their affirmative litigation, plaintiffs argue that offensive tactics may in some contexts be defensive. But plaintiffs do not persuasively explain how their affirmative litigation qualifies for coverage. Plaintiffs concede that their licensing suit against the Missouri Department of Health and Senior Services (DHSS) predated the water pipe incident. Plaintiffs assert that their suit against Cricket—a named insured under the Travelers policy—was a reasonable attempt to mitigate losses brought in reliance on Travelers's false statement that plaintiffs were not an insured under Cricket's policy. Plaintiffs cannot persuasively liken the suits to defensive attempts to defeat or offset liability, when plaintiffs merely sought to prosecute their own claims for what they believed to be their uninsured losses. To the extent plaintiffs maintain that their pursuit of these claims is intertwined with their defense against others' suits, this theory founders

---

under threat that the state would remediate and sue for its costs were damages imposed by law].)

16

on what we have explained is plaintiffs' failure to identify any suit against them that would trigger coverage.

As to the disciplinary action against Chaganti's brother, plaintiffs contend that the disciplinary proceedings were motivated by negative publicity about Chaganti's brother caused by the frozen water pipe incident. But whatever unalleged motivations led the state medical board to initiate the proceedings, their basis was the termination in 2006 of the brother's staff privileges at two different medical facilities for his alleged failures to report his affiliations with other hospitals.

### d. *Estoppel*

In December 2011, Robert Killingsworth, a Travelers insurance adjuster processing plaintiffs' claim against Cricket, told Chaganti that "Cricket's CGL policy is not for the 'benefit' of Whispering Oaks as it relates to *liability claimed against Cricket*. Whispering Oaks is not an insured under our policy in this matter." (Italics added.) Plaintiffs contend that, lacking a copy of the policy, they reasonably understood this statement as an assertion that Cricket's policy provided *no* coverage for plaintiffs as Cricket's lessor, and in reliance sued Cricket for failing to provide insurance for its lessor's benefit. Plaintiffs argue Killingsworth's e-mail constituted a coverage denial, and Travelers is now estopped from denying coverage on any ground other than plaintiffs' failure to qualify as an insured.

Generally, "estoppel requires '(1) an admission, statement, or act inconsistent with the claim afterwards asserted . . . , (2) action by the other party on the faith of such admission, statement, or act, and (3) injury to such other party, resulting from allowing the first party to contradict or repudiate the admission, statement, or act.' " (*Brown v. State Farm Mut. Auto. Ins. Co.* (Mo. 1989) 776 S.W.2d 384, 386 (*Brown*); see also *Feduniak v. California Coastal Com.* (2007) 148 Cal.App.4th 1346, 1359.) Although it ordinarily presents a question of fact, "where the facts are undisputed and only one

17

reasonable conclusion can be drawn from them, whether estoppel applies is a question of law." (*Feduniak*, at p. 1360.)

Under Missouri law, estoppel may preclude an insurer that first announces a specific defense and later seeks to rely on an inconsistent theory from asserting the inconsistent theory where "the announcement of the specific defense . . . lulls the insured into relying to his detriment and subsequent injury on the insurer's stated position." (*Brown*, *supra*, 776 S.W.2d at p. 389; see *id.* at p. 388.) But "absent a statement which excludes other defenses and upon which the insured reasonably relies in preparing to preserve its claim, estoppel is not applicable." (*Id.* at p. 389; see also *Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 34–35 [holding estoppel inapplicable where plaintiffs did not detrimentally rely on initial denial letter because plaintiffs could not reasonably believe that there was potential coverage].)

Here, Killingsworth's statement that Whispering Oaks was not the insured with respect to their suit against Cricket did not amount to a statement that Whispering Oaks could never be an insured under the policy, for any purpose. Nor do plaintiffs point to any statement limiting the bases on which Travelers might dispute coverage for any of the alleged proceedings at issue. We discern no factual basis to estop defendants from relying on the insurance policy's express scope to deny plaintiffs coverage both for their suit against Cricket and for their defense against the other proceedings they have identified.[15]

### e.    *Separate Statement*

Defendants' separate statement contained separate sets of facts addressing their request for summary judgment and their requests for summary adjudication of each cause

---

[15] Plaintiffs seem to argue that Travelers abandoned them by failing to notify them that the proceedings against them were covered. But that argument does not broaden the issues before us—it applies only if the proceedings against plaintiffs were covered in the first place.

18

of action. In defendants' requests for summary adjudication of some of the first six causes of action, defendants stated that summary adjudication was appropriate because they owed plaintiffs no duty to "defend or indemnify." Plaintiffs argue that the entire separate statement should have been stricken because each issue of duty must be addressed separately, and the duty to defend and indemnify are separate issues. (See Cal. Rules of Court, rule 3.1350(d)(1).) We disagree.

Defendants alternatively requested summary adjudication of causes of action, not issues of duty. Their separate statement addressed each cause of action separately. And defendants' contention was that there was no coverage in relation to any of the alleged proceedings, so there was no purpose to be served by repeating the same facts for both the duty to defend and the duty to indemnify. Under both Missouri and California law, there can be no duty to indemnify without a duty to defend under a policy such as this one. (See *Sprint Lumber, Inc. v. Union Ins. Co.* (Mo.Ct.App. 2021) 627 S.W.3d 96, 114; *Certain Underwriters at Lloyd's of London v. Superior Court* (2001) 24 Cal.4th 945, 958, 968.)

### f. *Plaintiffs' Causes of Action*

#### i. *Declaratory Judgment*

Plaintiffs' declaratory judgment claim included theories based on an alleged coverage dispute and an alleged dispute about plaintiffs' status as insureds. Plaintiffs contend that defendants failed to carry their initial burden on the declaratory relief claim because defendants addressed only the nonexistence of a duty to defend or indemnify but did not refute every theory in the operative complaint. (See *Teselle v. McLoughlin* (2009) 173 Cal.App.4th 156, 161–162 ["summary judgment may not be granted when the moving party has failed to 'refute [a] tenable pleaded theor[y]' "].) The implication is that even if Travelers owed plaintiffs no duty to defend or indemnify on the facts alleged, the declaratory relief cause of action remained triable because plaintiffs might in some other circumstances be entitled to benefits under the policy. The trial court implicitly

rejected this argument, disposing of the first cause of action because none of the underlying actions fell within the policy's coverage. We agree with the trial court.

Declaratory relief requires a justiciable controversy. (See *Gee v. St. Louis County Board of Election Commissioners* (Mo.Ct.App. 2025) 711 S.W.3d 593, 602 (*Gee*) [under Missouri law, " '[t]o grant a declaratory judgment, the court must be presented with: (1) a justiciable controversy that presents a real, substantial, presently-existing controversy admitting of specific relief, as distinguished from an advisory decree upon a purely hypothetical situation; (2) a plaintiff with a legally protectable interest at stake, "consisting of a pecuniary or personal interest directly at issue and subject to immediate or prospective consequential relief;" (3) a controversy ripe for judicial determination; and (4) an inadequate remedy at law' "]; *City of Cotati v. Cashman* (2002) 29 Cal.4th 69, 79 [under California law, " '[t]he fundamental basis of declaratory relief is the existence of an *actual, present controversy* over a proper subject' "]; *Wilson & Wilson v. City Council of Redwood City* (2011) 191 Cal.App.4th 1559, 1582 (*Wilson & Wilson*) [under California law, controversy must be justiciable]; *Gafcon, Inc. v. Ponsor & Associates* (2002) 98 Cal.App.4th 1388, 1402 (*Gafcon*) [a moving defendant may dispose of a declaratory relief cause of action at summary judgment "by establishing (1) the sought-after declaration is legally incorrect; (2) undisputed facts do not support the premise for the sought-after declaration; or (3) the issue is otherwise not one that is appropriate for declaratory relief"].)

Here, the justiciable controversy disclosed by plaintiffs' operative complaint concerns Travelers's obligation to cover certain claims. One component of the alleged dispute is plaintiffs' status as insureds under the relevant policy. But if the ultimate controversy is resolved on other grounds, there remains no reason to adjudicate plaintiffs' status as insureds under the policy because there remains at best the hypothetical possibility of a future dispute between these parties regarding plaintiffs' entitlement to

20

coverage for some other loss. (See generally *Gee*, *supra*, 711 S.W.3d at p. 602; *Wilson & Wilson*, *supra*, 191 Cal.App.4th at pp. 1582–1585.)

As to the core dispute, defendants demonstrated that the declaration sought would be legally incorrect. (See *Gafcon*, *supra*, 98 Cal.App.4th at p. 1402.) The predicate issues raised in the operative complaint were not independently appropriate for declaratory relief.

### ii.       *The Second through Sixth Causes of Action*

Each of the second through sixth causes of action is, as pleaded, predicated on the existence of coverage for at least one of the proceedings identified in plaintiffs' discovery responses. So the absence of coverage negates each cause of action.

Plaintiffs argue that the coverage issue does not resolve their fifth cause of action for fraud because they were harmed by what they characterize as Killingsworth's false statement that they were not insured under the policy, including by relying on the statement to sue Cricket.[16] But the summary judgment motion must respond to the allegations pleaded in the complaint. (*Berlanga v. University of San Francisco* (2024) 100 Cal.App.5th 75, 87.) And what plaintiffs pleaded was that they relied on the alleged false representations by refraining from enforcing Travelers's putative duty to defend and indemnify them. By demonstrating that Travelers had no duty to provide coverage for the identified proceedings, defendants negated essential elements of the cause of action. (See, e.g., *Dean v. Noble* (Mo.Ct.App. 2015) 477 S.W.3d 197, 204 [essential elements of fraud in Missouri include "proximately caused injury"]; *Lim v. The.TV Corp. Internat.* (2002) 99 Cal.App.4th 684, 694 [essential elements of fraud in California include "resulting damage"].)

---

[16] We cannot discern any theory in plaintiffs' appellate briefing or operative complaint by which the second, third, fourth, or sixth causes of action could proceed absent a coverage obligation.

**2.      *The Seventh Cause of Action: Conspiracy to Injure***

As the bases for the seventh cause of action, plaintiffs alleged that defendants (1) advised Cricket not to comply with its duty to defend, indemnify, and hold plaintiffs harmless under the lease; and (2) induced Cricket to terminate the lease.  Given this framing, the cause of action turns not on plaintiffs' entitlement to coverage under the policy but defendants' alleged involvement in Cricket's decisions to act.  On defendants' motion, the trial court ruled that plaintiffs' claim accrued by January 2012, when Cricket terminated the lease, and that even under Missouri's five-year statute of limitations, the seventh cause of action was barred by the statute of limitations.

On appeal, plaintiffs contend that they are asserting a tort claim based on interference with a contract under Missouri law.  Although plaintiffs agree that the Missouri statute of limitations is generally five years, they invoke the discovery rule to argue that their claims did not accrue under Missouri law until they suspected Travelers played a role in causing Cricket's breach.  Alternatively, plaintiffs contend that Travelers is estopped from relying on the statute of limitations because it concealed the existence of the insurance policy and plaintiffs' status as insureds under the policy.  We conclude that the seventh cause of action is time-barred.[17]

**a.      *The Statute of Limitations at Summary Judgment***

"The 'statute of limitations . . . is an affirmative defense that "seeks to defeat or avoid a plaintiff's cause of action, and alleges that even if plaintiff's petition is true, plaintiff cannot prevail because there are additional facts that permit the defendant to

---

[17] Plaintiffs contend that Missouri substantive law governs the statute of limitations analysis.  But they also invoke California law to support their theory of delayed discovery.  Neither the trial court nor defendants express an opinion; the trial court in its order and defendants in their appellate brief both opined that the result would be the same under either Missouri or California law.  Because we conclude that the result is the same under either body of law, we do not resolve the choice of law issue.

avoid legal responsibility." ' " (*Wolfe v. Walker* (Mo.Ct.App. 2025) 713 S.W.3d 536, 542; see also *Norgart v. Upjohn Co.* (1999) 21 Cal.4th 383, 396 (*Norgart*).)

"If the moving defendant argues that it has a complete defense to the plaintiff's cause of action, the defendant has the initial burden to show that undisputed facts support each element of the affirmative defense.  Once it does so, the burden shifts to plaintiff to show an issue of fact concerning at least one element of the defense.  [Citation.]  If, in anticipation of an affirmative defense, the complaint alleges facts to refute it, the pleadings themselves create 'a material issue which defendant[ ] would have . . . to refute in order to obtain summary [judgment].'  [Citation.]  In the absence of such allegations, the plaintiff can avoid summary judgment only by presenting evidence sufficient to raise a triable issue concerning the affirmative defense." (*Bacon v. Southern Cal. Edison Co.* (1997) 53 Cal.App.4th 854, 858; see also *Wang v. Nesse* (2022) 81 Cal.App.5th 428, 438.)

"While resolution of the statute of limitations issue is normally a question of fact, where the uncontradicted facts established through discovery are susceptible of only one legitimate inference, summary judgment is proper." (*Jolly v. Eli Lilly & Co.* (1988) 44 Cal.3d 1103, 1112; see also *Bartel v. Chicago Title Ins. Co.* (2025) 111 Cal.App.5th 655, 679 ["the application of the statute of limitations on undisputed facts is a purely legal question that we review de novo"].)

### b.    *Applicable Limitations Period*

In their opening brief, plaintiffs contend that they pleaded a Missouri law claim for tortious interference with a contract or business expectancy and conspiracy to interfere with a contract.  (See *Rice v. Hodapp* (Mo. 1996) 919 S.W.2d 240, 245; *Fischer, Spuhl, Herzwurm & Associates, Inc. v. Forrest T. Jones & Co.* (Mo. 1979) 586 S.W.2d 310, 315; see also *Ixchel Pharma, LLC v. Biogen, Inc.* (2020) 9 Cal.5th 1130, 1141 [stating elements for tortious interference with contractual relations under California law].)

23

Under Missouri law, the applicable limitations period is five years from accrual.  (See Mo. Rev. Stat. § 516.120; *D'Arcy & Associates, Inc. v. K.P.M.G. Peat Marwick, L.L.P.* (Mo.Ct.App. 2004) 129 S.W.3d 25, 29 (*D'Arcy*); *Hartman v. Logan* (Mo.Ct.App. 2020) 602 S.W.3d 827, 838.)  Under California law, the limitations period is two years from accrual.  (See *Optronic Technologies, Inc. v. Celestron Acquisition, LLC* (2025) 108 Cal.App.5th 770, 789.)

Plaintiffs alternatively argue that the limitations period should be longer, relying on Missouri statutes applicable to claims for fraud.  (See Mo. Rev. Stat. § 516.120(5).)  But the seventh cause of action is plainly not a claim for fraud.

### c.  *Accrual*

"Generally, ' "a statute of limitations begins to run when the cause of action has accrued to the person asserting it, the accrual being whenever such a breach of duty has occurred, or such a wrong has been sustained, as will give a right then to bring and sustain a suit." ' "  (*D'Arcy*, *supra*, 129 S.W.3d at p. 29; see also *Norgart*, *supra*, 21 Cal.4th at p. 397.)  Absent some basis for modifying the accrual date, plaintiffs' interference claim accrued in or before January 2012.

Plaintiffs' first theory of liability—that Travelers conspired with Cricket to refuse to defend, indemnify, and hold plaintiffs harmless under the lease—is on the face of the operative complaint based on December 2011 e-mails that Killingsworth sent to plaintiffs denying coverage under the Travelers policy.  To the extent plaintiffs' seventh cause of action is based on Cricket's failure to honor its obligation to supply insurance under the policy—whether by failing to procure a policy or failing to disclose the policy—plaintiffs were aware of that failure in December 2011.  Defendants submitted evidence that by that time, accepting plaintiffs' theories about the proceedings that were subject to the duty to defend, plaintiffs had suffered ascertainable damages flowing from the breach of duty— plaintiffs began requesting coverage in 2010.  (See *D'Arcy*, *supra*, 129 S.W.3d at p. 29

[damage is ascertainable "when it can be discovered or is made known, even if its extent remains unknown"].)

Plaintiffs' second theory of liability—that Travelers induced Cricket to terminate the lease—accrued when Cricket terminated the lease in January 2012. At that time, the alleged breach had occurred and caused plaintiffs ascertainable harm—the loss of benefit of the contract.

### d. *Extension of the Limitations Period*

Applying a January 2012 accrual date, plaintiffs' complaint was untimely even under Missouri's five-year limitations period. But "[t]o align the actual application of the limitations defense more closely with the policy goals animating it, the courts and the Legislature have over time developed a handful of equitable exceptions to and modifications of the usual rules governing limitations periods. These doctrines may alter the rules governing either the initial accrual of a claim, the subsequent running of the limitations period, or both." (*Aryeh v. Canon Business Solutions, Inc.* (2013) 55 Cal.4th 1185, 1192 (*Aryeh*); but see *Ambers-Phillips v. SSM DePaul Health Center* (Mo. 2015) 459 S.W.3d 901, 907 [while Missouri Supreme Court has "recognized the fairness of adopting a discovery rule and of equitable tolling in regard to the statute of limitations, . . . these cases have emphasized that it is up to the legislature to determine whether to adopt a discovery rule or equitable tolling in a particular case"].) These exceptions include the discovery rule and fraudulent concealment.[18] (See *Aryeh*, at p. 1192;

---

[18] Plaintiffs also use the phrase "equitably tolled" in their appellate reply brief. The cited authority is a California case explaining "that a defendant may be equitably estopped from asserting the statute of limitations when, as a result of intentional concealment, the plaintiff is unable to discover the defendant's actual identity." (*Bernson v. Browning-Ferris Industries* (1994) 7 Cal.4th 926, 936 (*Bernson*).) This flavor of equitable tolling, which is predicated on a specific type of fraudulent concealment, tolls the statute "until such time as the plaintiff knows, or through the exercise of reasonable diligence should have discovered, the defendant's identity." (*Ibid*.) It is distinct from the equitable tolling described in *Aryeh*, which "suspend[s] or extend[s] the statute of limitations when a plaintiff has reasonably and in good faith chosen to pursue one among

25

*Ambers-Phillips*, at p. 907; *Schultz v. Bank of Am. Merrill Lynch Credit Corp.* (Mo.Ct.App. 2022) 645 S.W.3d 689, 698; Mo. Rev. Stat. § 516.280.) Plaintiffs invoke or allude to each of these doctrines.

Missouri law permits tolling where a person by an " 'improper act . . . prevent[s] the commencement of an action.' " (*State ex rel. Heart of Am. Council v. McKenzie* (Mo. 2016) 484 S.W.3d 320, 325.) "Improper acts are 'uniformly held to mean some act on the part of the defendant that would hinder or delay the commencement of a suit, the service of process or some necessary step in relation thereto.' " (*Ibid.*) Fraudulent concealment, also recognized as a basis for tolling the limitations period in California, is among the cognizable "[i]mproper acts." (*Ibid.*; see also *Aryeh*, *supra*, 55 Cal.4th at p. 1192.) In California, the discovery rule postpones accrual "until the plaintiff discovers, or has reason to discover, the cause of action." (*Fox v. Ethicon Endo-Surgery, Inc.* (2005) 35 Cal.4th 797, 807.) "A plaintiff has reason to discover a cause of action when he or she 'has reason at least to suspect a factual basis for its elements,' " "wrongdoing, causation, and harm." (*Ibid.*) The discovery rule allows accrual "even if the plaintiff does not have reason to suspect the defendant's identity . . . [Citation.] . . . because the identity of the defendant is not an element of a cause of action." (*Ibid.*) Where necessary to withstand a demurrer to a complaint that appears on its face untimely, a plaintiff relying on the discovery rule " 'must specifically plead facts to show (1) the time and manner of discovery *and* (2) the inability to have made earlier discovery despite reasonable diligence.' " (*Id.* at p. 808.)

The only allegations in plaintiffs' operative complaint that relate to a potential statute of limitations defense are that (1) plaintiffs did not learn about the "existence" of the Travelers policy until around March 2018, (2) plaintiffs did not have "an opportunity

several remedies and the statute of limitations' notice function has been served." (*Aryeh*, *supra*, 55 Cal.4th at p. 1192.) For the foregoing reasons, we treat this argument as a species of fraudulent concealment.

to review the . . . policy . . . in March 2018" when Cricket produced it in litigation, and plaintiffs relied on Killingsworth's December 2011 e-mails for the proposition that plaintiffs were not insured under Cricket's policy with Travelers. While plaintiffs' lack of information about the insurance policy might explain their delay in raising coverage claims against Travelers, their seventh cause of action does not depend on plaintiffs' knowledge of the policy. Rather, the pleaded claim flows from Cricket's actions— Cricket's failure to defend and indemnify plaintiffs or its termination of the lease. Because plaintiffs' allegations about the insurance policy are immaterial to the seventh cause of action, defendants did not need to refute them to carry their initial burden on the seventh cause of action. Rather, defendants carried their initial burden on the seventh cause of action under Missouri or California law by demonstrating that all the generic elements of the cause of action arose, and damages were ascertainable, more than five years before plaintiffs filed their complaint.[19]

In their appellate reply brief, plaintiffs refocus on their difficulty identifying defendants' participation in the termination of the lease. But insofar as plaintiffs have identified their reasons for suspecting that Cricket's breach was tortious, their reasons are that Cricket invoked the lease provision for termination if "Lessee . . . determines that the Premises are not appropriate or suitable for its operations for economic, environmental or technological reasons" without having made any prior complaints. While plaintiffs make passing reference to "conceal[ment]" of Travelers's "role in terminating the lease," they neither explain how Travelers intentionally concealed its participation in Cricket's

---

[19] Plaintiffs contend that it was improper under California Rules of Court, rule 3.1350(d)(1) for defendants to address three distinct grounds for summary adjudication of this cause of action in a single section of the separate statement— combining "a 'cause of action,' an 'issue of duty,' *and* an 'affirmative defense', further combining two defendants in one 'issue.' " But plaintiffs supply neither authority nor argument for their assertion that the perceived deficiency compelled the trial court to strike the separate statement.

decision to terminate the lease nor how such concealment delayed the accrual of the cause of action as pleaded. (Cf. *Bernson*, *supra*, 7 Cal.4th at p. 936.) Put in terms of delayed discovery, plaintiffs fail to explain what facts they did not know in January 2012, the later discovery of which caused them to suspect that Travelers induced Cricket to terminate the lease.[20]

## B.     *Motion to Compel*

Plaintiffs contend that the trial court barred proper discovery of communications between Travelers and Cricket, preventing plaintiffs from developing evidence that "the two colluded to terminate the lease to punish [p]laintiffs for demanding insurance coverage." Defendants argue that it is unnecessary to review the ruling on any motion to compel, and the ruling was in any event sound, because there are no documents responsive to plaintiffs' request for communications between Travelers and Cricket.

We recognize the relevance of the requested discovery to the merits of the seventh cause of action alone. But because the trial court properly deemed the seventh cause of action untimely, plaintiffs' ability to discover communications meant to fortify their substantive claim was immaterial to the summary judgment ruling. Any error in preventing plaintiffs from taking this discovery was harmless.

## C.     *Costs*

Because plaintiffs did not prevail on any cause of action, we reject their contention that the trial court erred in awarding defendants costs as the prevailing parties. (See Code Civ. Proc., § 1032, subd. (a)(4); see generally *Berkeley Cement, Inc. v. Regents of University of California* (2019) 30 Cal.App.5th 1133, 1139 [standard of review].) Plaintiffs do not challenge the amount of costs fixed by the trial court.

---

[20] Even if plaintiffs' suspicion was aroused by their review of the Travelers policy, there remains no connection between the policy and the seventh cause of action.

28

## III.   DISPOSITION

The judgment is affirmed.

_____

LIE, J.

WE CONCUR:

_____

GREENWOOD, P. J.

_____

GROVER, J.

*Whispering Oaks Residential Care Facility LLC et al. v. Travelers Property Casualty Co. of America et al.*
H052423